**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHINIC DAVIS, individually and also on behalf of E.D., her minor son as his mother and natural guardian | ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. A. No. 13-1329 |
| v. | ) ) | |
| QUAKER VALLEY SCHOOL DISTRICT, BARBARA MELLETT, HEIDI ONDEK, JOSEPH CLAPPER and ERIK LINDEMANN, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CONTI, Chief District Judge

## I.    INTRODUCTION

Plaintiff Shinic Davis ("Davis") accuses the Quaker Valley School District ("QVSD" or the "district"), Dr. Joseph Clapper ("Clapper"), Dr. Heidi Ondek ("Ondek"), Dr. Barbara Mellett ("Mellett"), and Erik Lindemann ("Lindemann" and collectively with QVSD, Clapper, Ondek, and Mellett, "defendants") of subjecting her son to repeated and wrongful discipline as compared to other students, as well as wrongfully denying her, as a parent, access to the school.  Davis asserts race-based discrimination and retaliation claims pursuant to 42 U.S.C. § 2000d *et seq* ("Title VI") and a race-based discrimination claim under 42 U.S.C. § 1981 on behalf of her son, E.D.[1], a race-based discrimination claim under § 1981 and retaliation claims under Title VI and § 1981 on behalf of herself, and constitutional claims under 42 U.S.C. § 1983, alleging violations

---

[1] For privacy purposes, all minors will be identified only by their initials.

of her free speech rights and both her son's and her equal protection rights. Davis additionally asserts companion retaliation claims for E.D. and herself under the Pennsylvania Human Relations Act, 43 Pa. Stat. §§ 951-963 (the "PHRA").[2]

Presently before the court is defendants' motion for summary judgment with respect to all claims asserted by Davis on her behalf and on behalf of her son. (ECF No. 46). Defendants also filed a brief in support of their motion, (ECF No. 47), a concise statement of material facts, (ECF No. 48), an appendix, (ECF No. 49), a reply brief, (ECF No. 59), a response to Davis's counterstatement of material facts, (ECF No. 60), and a supplemental appendix, (ECF No. 61). In response to the motion, Davis filed an opposition brief, an appendix, a statement of material facts that both responded to defendants' concise statement of material facts and included a separate counterstatement, and a sur-reply brief. (ECF Nos. 53-55, 66). The parties also jointly submitted a combined concise statement of material facts. (ECF No. 65).

The matter is fully briefed and ripe for disposition. For the reasons that follow in this memorandum opinion, defendants' motion will be granted and judgment will be entered against Davis on all claims.

## II.   FACTUAL BACKGROUND

All material facts set forth below are undisputed unless otherwise indicated. Additional material facts may be discussed elsewhere in this memorandum opinion, in context. The parties' combined concise statement of material facts ("CCSMF") is docketed at ECF No. 65 and is cited to that docket number. The CCSMF in this case is especially convoluted. The underlying record

---

[2] Claims under the PHRA are treated the same as Title VI and § 1981 claims. *See Pryor v. National Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002) (Title VI and § 1981 claims treated the same); *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (§ 1981 and PHRA claims treated the same). The resolution of the Title VI and § 1981 claims will be dispositive of the PHRA claims.

had to be reviewed in order to determine those facts that are reasonably disputed, and those that are not. In doing so, all reasonable inferences are drawn in favor of Davis, the nonmoving party. Inferences based upon speculation or conjecture, however, do not create a material factual dispute sufficient to defeat a motion for summary judgment. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

### A. **E.D. and the School**

E.D. was a second-grade student at Osborne Elementary School ("Osborne" or the "school") during the 2011-2012 school year. (ECF No. 65 ¶ 1). Osborne is part of QVSD. (*Id.*). At all relevant times, defendant Clapper was the superintendent of QVSD; defendant Ondek was the assistant superintendent of QVSD; defendant Mellett was the principal of Osborne; and defendant Lindemann was E.D.'s primary second-grade teacher. (*Id.* ¶ 2). Lindemann has been a teacher for sixteen years. (*Id.* ¶ 6).

E.D. attended first grade at Edgeworth Elementary School ("Edgeworth"), which is the other elementary school in the district. (*Id.* ¶¶ 3-4). Davis transferred her son to Osborne for the next school year. (*Id.* ¶ 5). She testified that she felt the teachers at Edgeworth did not always treat her son fairly, but that those situations were satisfactorily resolved. (ECF No. 49 at 17 (Davis Depo. at 63:2-17)). Her reasons for transferring E.D. to Osborne were because she moved and a new person was to going to become the gifted services teacher at Edgewood. (*Id.* at 15 (Davis Depo. at 55:11-56:10)).

Lindemann's second-grade class consisted of sixteen students, and although there were students from a number of backgrounds, E.D. was the only African American student. (ECF No. 65 ¶ 7). Lindemann organized the desks in his classroom into clusters and would sometimes

3

have the students rotate from one cluster to another to work on different subjects while he moved around the room. (*Id*. ¶¶ 8-9). Because of the number of students, there was always a cluster of desks open. (*Id*. ¶ 8). Students were generally expected to stay in their seats during direct instruction and while working independently, but defendants acknowledge that there is often a lot of activity in a second-grade classroom and some amount of movement is expected and tolerated. (*Id*. ¶ 10).

Davis testified that, as early as September 2011, she began having concerns that the school was treating E.D. unfairly and accusing him of things he did not do. (ECF No. 49 at 26 (Davis Depo. at 99:21-100:11)). These concerns were based upon her conversations with E.D. (*Id*.).

E.D. and other students attended a program at the YMCA in the morning and then rode a bus to the school. (*Id*. ¶ 14). Emails from Lindemann and Mellett to Davis reported problems with E.D.'s behavior on the bus in October 2011. (ECF No. 49-2 at 322, 324-26 (Emails)). Lindemann describes one incident where E.D. was moving too fast and bumping into people while getting off the bus and that he would not listen to the teacher on duty. (*Id*. at 322 (Lindemann Email)). Lindemann told Davis that E.D. denied having done anything wrong when he spoke with him afterwards. (*Id*.). E.D. and D.I., another student who rode the bus and attended the program at the YMCA, often came into conflict. (ECF No. 65 ¶ 14). The court will discuss D.I. in more detail later.

In another incident early in the school year, several first-grade girls told school officials that E.D. hit them in the face in the cafeteria. (ECF Nos. 65 ¶ 26; 49-1 at 185 (Mellett Depo. at 52:13-53:3)). Security camera footage showed E.D. walking toward the girls, but the camera

rotated away from the scene. (ECF Nos. 65 ¶ 26; 49-1 at 185 (Mellett Depo. at 53:7-12)). Mellett attempted to discuss the alleged incident with E.D., but Davis picked him up from school before she could finish the conversation. (ECF No. 49-1 at 186 (Mellett Depo. at 54:8-13)). Davis denies that E.D. struck the first-grade girls, and the parties appear to dispute whether E.D. was punished for this incident. (ECF No. 65 ¶ 26).

This lawsuit primarily centers on E.D.'s behavioral problems in Lindemann's classroom and the school's handling of that conduct. The parties present starkly different depictions. Generally speaking, defendants aver that E.D. had significant behavioral problems, and while other students occasionally engaged in the same behaviors as E.D., no other student did so with the same frequency or intensity. (ECF Nos. 65 ¶ 31; 49 at 134, 139, 166 (Lindemann Depo. at 45:5-6, 64:9-66:5, 170:1-171:2)). According to Lindemann, these behaviors included outbursts of anger, screaming, and crying; jumping, and squirming in his seat; throwing his pencil; rolling around the floor; and pushing and bumping into other students. (ECF No. 49 at 134, 139, 166 (Lindemann Depo. at 45:5-6, 63:9-66:5, 170:1-172:21)). Lindemann testified that E.D. threw his chair in the "proximity" of other students on at least one occasion, although Lindemann did not know whether E.D. intended to throw the chair at the other students. (*Id*. at 161 (Lindemann Depo. at 151:19-152:11)). Lindemann testified that E.D. would often tease other students, get in their faces, and once told a girl that he was going to make a robot and send it to her house to kill her parents. (*Id*. at 164 (Lindemann Depo. at 164:22-165:9)).

E.D. testified that while he was not perfect, he generally did not misbehave and that he would often be blamed and punished for things he did not do, while other students would not be

5

punished for similar conduct.[3]  (*Id*. at 117-19 120 (E.D. Depo. at 58:12-15, 65:1-14, 66:10-23, 72:21-73:8)).  Davis likewise avers in her filings that the school often accused her son of things he did not do, and that, while not perfect, his behavior was typical of a seven-year-old child and similar to other students in the class.  (ECF Nos. 55 at 3 (Pl.'s Brief); 65 ¶¶ 30, 41, 84).  However, Davis admits that she was never present during any of the times school officials claim her son misbehaved and that her knowledge of E.D.'s behavior comes from conversations with E.D. and others.  (ECF Nos. 65 ¶ 30; 49 at 52 (Davis Depo. at 202:3-21)).

Lindemann testified that other parents who volunteered in his classroom commented that E.D.'s behaviors were bad for the class environment.  (ECF Nos. 65 ¶ 36; 49 at 158-59 (Lindemann Depo. at 141:18-142:4)).  Davis testified that when she spoke to other parents about E.D.'s behavior, they said they did not see anything out of the ordinary.  (ECF Nos. 65 ¶ 36; 49 at 50 (Davis Depo. at 194:8-16)).

The parties agree that Lindemann would sometimes have E.D. sit by himself in an open cluster of desks, but they disagree about the reason.  (ECF No. 65 ¶ 33).  According to defendants, Lindemann would move E.D. when he misbehaved; a strategy that teachers employ to help a student regroup and refocus.  (*Id*. ¶ 33).  Davis denies that it was an isolated occurrence or a response to a specific act on the part of her son.  (*Id*.).  Mellett testified that "the behaviors [E.D.] exhibited created a situation whereby we needed to be more mindful of what he was doing in the classroom."  (ECF Nos. 65 ¶ 35; 49-1 at 206 (Mellett Depo. at 134:17-20)).  Davis denies that her son's behavior warranted additional attention.  (ECF Nos. 65 ¶ 35).

Lindemann and Davis discussed E.D.'s progress several times throughout the fall of

---

[3] At the time of his deposition, E.D. was in fifth grade and attending online cyber school.  (*Id*. at 105 (E.D. Depo. at 10:25-11:5)).  E.D. testified that he attended three other elementary schools for third and fourth grade, and said that at all three he was falsely accused of misbehaving.  (*Id*. at 106-10 (E.D. Depo. at 15:19-31:9)).

2011, during which Lindemann emphasized optimism, but also relayed some behavioral concerns. (ECF Nos. 65 ¶ 38; 49 at 128 (Lindemann Depo. at 20:5-21:6)). In an email to his fellow teachers dated October 13, 2011, he struck a similar tone, stating that E.D.'s behavior had improved since last year and he is "an awesome student," but there were some behavioral problems and E.D. needs help. (ECF No. 54 at 580 (Lindemann Email)). In November 2011, Lindemann suggested that E.D. join a behavior group. (ECF Nos. 65 ¶ 39; 54 at 564 (Davis Decl. ¶ 10)). Davis rejected the suggestion because she felt it was "premature and unnecessary" and she worried it "might be associated with an overall trend in which educators stereotype male African American adolescents . . . ." (*Id.*). Defendants assert that whenever they mentioned E.D.'s behavior to Davis, she would not acknowledge that he had done anything wrong and would focus, not on his behavior, "but everything else around it." (ECF Nos. 65 ¶ 40; 49 at 132, 142 (Lindemann Depo. at 37:2-15, 76:18-21); 49 at 190 (Mellett Depo. at 72:3-13)). Davis describes the school's efforts to keep her informed as "sporadic" and characterizes her own attitude as "proactive" and focused on identifying the source of the alleged behavior. (ECF Nos. 65 ¶ 40; 54 at 562-63 (Davis Decl. ¶¶ 3, 7)).

The parties appear to agree that the situation began to escalate in January 2012, but on little else. (ECF No. 65 ¶ 41). Mellett testified that E.D.'s behavioral problems worsened in January 2012, based upon her communications with his teachers, her classroom observations, and how often E.D. was in the office. (ECF Nos. 65 ¶ 41; 49-1 at 187 (Mellett Depo. at 59:10-15)). Davis denies this characterization and calls it a pretext for increased scrutiny of E.D. (ECF No. 65 ¶ 41). Davis claims that she began "openly questioning the way Lindemann was treating her son" in January 2012. (ECF Nos. 65 ¶ 41; 49-2 at 345-48 (emails); 54 at 568-69 (Davis

Notes)).  In support of this assertion, Davis cites to her own notes and an email exchange in which she told Mellett she needed to reschedule a meeting to discuss concerns regarding Lindemann.  (ECF No. 65 ¶¶ 41, 113).  Davis and Lindemann had a conversation on January 30, 2012, that they agree "transformed their relationship." During that conversation Davis told Lindemann she had a problem with him and could no longer talk to him about E.D.  (ECF No. 65 ¶¶ 41-42, 114).  Davis continued to express concerns of daily mistreatment of her son to both Mellett and Ondek.  (*Id*. ¶ 43).  Her concerns included that Lindemann would closely watch and falsely accuse E.D.  (*Id*.).  Davis also informed defendants that she was consulting with an attorney and threatened to file a complaint with the Pennsylvania Human Rights Commission ("PHRC"), as well as a lawsuit.  (*Id*. ¶ 45).

The parties dispute whether and to what extent defendants investigated Davis's complaints about Lindemann's treatment of her son.  (*Id*. ¶ 47).  Mellett conducted observations of Lindemann's classroom.  (*Id*. ¶ 49).  Mellett testified that during these visits she observed that E.D. could be "combative" at times; he sometimes did what he wanted rather than what the teacher directed him to do; and he would sometimes run around the room or get physical with other students.  (ECF Nos. 65 ¶ 49; 49-1 at 188-90 (Mellett Depo. at 65:13-71:6)).  Ondek testified that Mellett and she "continued to find no evidence" that E.D. was mistreated daily and that it became apparent to them that Davis's claims were unfounded.  (ECF No. 49-1 at 224 (Ondek Depo. at 46:10-20)).

On the morning of February 8, 2012, one of the teachers on bus duty, Mrs. Shaughnessy, reported that E.D. leapt off the bus and starting running for the door.  (ECF No. 49-2 at 353 (Shaughnessy Report)).  According to Mrs. Shaughnessy, E.D. ignored her repeated directions to

slow down, raised both of his arms, and began pushing against her when she attempted to block his path. (*Id*.). Mrs. Shaughnessy claimed that she had to take E.D. by the hand and lead him into the building. (*Id*.). In the hallway, she said that E.D. pulled on her arm, pushed against her, and used his other hand to try and bend her fingers backwards. (*Id*.). Mrs. Shaughnessy's report indicates that E.D. calmed down when they passed several second-grade teachers in the hall, at which point Mrs. Shaughnessy turned E.D. over to Lindemann. (*Id*.). Davis denies that E.D. attempted to bend Mrs. Shaughnessy's fingers, and takes the position that she used excessive force on her son, based on the account of E.D.'s sister who witnessed the incident. (ECF Nos. 65 ¶ 52; 49 at 79 (Davis Depo. at 88:6-16)). E.D.'s sister claimed that Mrs. Shaughnessy grabbed E.D. and yanked him down the hall. (*Id*.). Davis filed a complaint against Mrs. Shaughnessy with the local police department. (ECF No. 65 ¶ 53). The police declined to prosecute. (*Id*. ¶ 54).

Davis contacted the school and made arrangements to observe Lindemann's class on February 9, 2012. (*Id*. ¶ 55). The parties dispute whether the school had a policy or procedure in 2012 that required parents to schedule classroom observations in advance. (*Id*. ¶ 56). The record contains only the school's Parent Handbook for the 2013-2014 school year, which does contain such a policy. (ECF No. 49-3 at 545 (Handbook at 39)). Clapper testified that such a procedure was in place in 2012, (ECF No. 49-1 at 248 (Clapper Depo. at 64:18-22)), but Davis testified that no such policy was ever communicated to her at the time (ECF Nos. 65 ¶ 56; 49 at 83 (Davis Depo. at 103:14-21)). Regardless, the parties apparently agree that Davis arranged for the February 9, 2012 visit in advance and that school officials permitted her to observe the classroom on that day. During this visit, Davis observed for approximately thirty minutes and may have

told Lindemann that she had a problem with him on her way out. (ECF No. 65 at ¶¶ 59-60). Davis's notes indicate that during the observation she saw that E.D. was the only student seated by himself; Lindemann was keeping track of E.D.'s behaviors on a chart; and other students were permitted to leave their seats and were either not redirected at all or redirected "without being treated negatively." (ECF Nos. 65 ¶ 121; 54 at 570-71 (Davis Notes)). Defendants dispute this characterization and cite Davis's deposition testimony that she was unable to recall many specifics from her observation. (ECF Nos. 65 ¶ 121).

Immediately following her classroom observation, Davis met with Clapper and Ondek during which she was critical of Lindemann and "expressed concern that E.[D.] was treated differently than other children." (*Id*. ¶ 119). Davis attempted to do another classroom observation the very next day, February 10, 2012, without submitting a request in advance and was not permitted to do so. (*Id*. ¶ 61). Defendants assert Davis was denied access because she failed to follow the procedure; Davis asserts that no such procedure existed at the time and officials denied access in retaliation. (*Id*.). Ondek testified that there were "many instances where [Davis] would appear at school unannounced" and expect to participate or observe and that she became "combative" when school officials would not allow her to because she had not provided advanced notice. (ECF No. 49-1 at 226-27 (Ondek Depo. at 57:21-58:5)). Davis denies this assertion. (ECF No. 65 ¶ 62).

On February 16, 2012, Davis emailed an attorney – and copied Lindemann – alleging that the learning environment at Osborne was unsafe for her son and that she would be forwarding more information and seeking to file a lawsuit. (*Id*. ¶ 64). Later on, Davis contacted Robert Morris University to complain that Lindemann and his student teacher (from the university) were

mistreating E.D. (*Id*. ¶ 65). Lindemann became concerned that Davis's conduct, which he characterized as "harassment," negatively affected his working conditions and threatened his reputation and livelihood. (ECF Nos. 65 ¶¶ 66, 126, 137; 49-2 at 360 (Lindemann Email)). In one email dated February 16, 2012, and sent to Ondek, Mellet, and Rose Ann Bergandy (a school counselor), Lindemann wrote about Davis's email to the attorney:

> I know I have the full support of the district, but [Davis's] behavior is becoming increasingly irrational and I would like to make sure I am protected from slander, harassment, or any other legal actions. I also feel an inordinate amount of pressure as I seek to ensure a positive environment for my students and student teacher. Without [Davis's] support of our authority with [E.D.], he has become extremely defiant. We will continue to handle it appropriately, but in [Davis's] eyes, we've already crossed a line. She specifically said she has a major problem with me and [E.D.'s] oppositional behavior seems to reflect these feelings.

(ECF No. 49-2 at 360 (Lindemann Email)). Lindemann contacted his teachers' union for help with E.D. and protection from Davis. (ECF No. 65 ¶¶ 68, 131). The union agreed with Lindemann, or, as Davis puts it, "took its member's side." (*Id*. ¶ 69). Union representatives met with school officials and consulted with the union's attorney in order to find ways to protect Lindemann. (*Id*. ¶ 70).

As the situation escalated, defendants assert that Davis's view that the school was to blame rather than her son's behavioral problems emboldened E.D. and gave him "carte blanche to do whatever he wants whenever he wants because Mom keeps saying it is the classroom environment that is making him misbehave." (ECF Nos. 65 ¶ 72; 49-2 at 351, 360 (Emails)). Davis rejects this assessment and argues that the intense scrutiny and punitive measures imposed on E.D. caused him to feel singled out and provoked oppositional behavior. (ECF Nos. 65 ¶ 72).

An individual named Floyd Faulkner ("Faulkner") was contacted to help resolve the differences between Davis and the school district. (*Id*. ¶¶ 75, 79). There is some discrepancy in

the record about whether it was the school district or Davis that originally contacted Faulkner. (*Id*. ¶¶ 75-76). Faulkner, who is African American, works with child-centered agencies in the community and school officials often refer students who are struggling and may benefit from his efforts to connect students with additional resources. (*Id*. ¶ 77). Davis first met Faulkner through an after-school program her daughter attended. (*Id*. ¶ 78). Faulkner spoke with Davis as well as Mellett and Lindemann. (*Id*. ¶¶ 80-81). Faulkner arranged with school officials to perform a classroom observation, although Davis expressed some concern that he was no longer an impartial third party after he met with Mellett and Lindemann. (*Id*. ¶ 82). Faulkner observed Lindemann's class on February 23, 2012, and noted that while E.D. was seated by himself, he did not see any misbehavior from E.D. and that Lindemann was very attentive to E.D.'s needs and his class was well run. (ECF Nos. 65 ¶ 83; 49-1 at 265, 267-68 (Faulkner Depo. at 48:6-14, 57:19-58:22)).

Although the parties disagree about Lindemann's motivations, they agree that Lindemann began documenting E.D.'s behavior and how Lindemann dealt with it in a reflections journal around February 1, 2012, right after Davis told Lindemann she would no longer speak with him. (*Id*. ¶¶ 73, 93, 115-16). Lindemann testified that he documented E.D.'s behaviors before that, just not at that level. (ECF Nos. 65 ¶¶ 115; 49 at 135 (Lindemann Depo. at 46:24)). Defendants developed an RTII[4] behavioral plan for E.D. which they presented at a February 27, 2012

---

[4] RTII is the abbreviation for "Responsive to Instruction and Intervention." (*Id*. ¶ 19). Defendants characterize the RTII program as "a positive behavior program that is non-punitive, therapeutic and supportive." (*Id*.). While teachers make the initial referral of students with academic, social, emotional, or behavioral issues to the RTII program, at least the more advanced phase of the process requires parental consent. (*Id*. ¶¶ 20, 23). Part of the program involves a student's teacher entering data into a performance tracking computer program. (*Id*. ¶ 22). The record is somewhat ambiguous about the finer points of how the program operates. (*See id*. ¶¶ 21, 23). While defendants make a few arguments involving the RTII process, (ECF No. 47 at 21-22 (Defs.' Brief)), plaintiff generally takes the position that it is irrelevant to the case, (ECF No. 65 ¶ 19). The court agrees with plaintiff.

meeting attended by Davis, E.D.'s father, Mellett, Lindemann, Burgandy, and another teacher, Ms. Floro. (ECF Nos. 65 ¶¶ 85-86; 49-2 at 413-417 (Behavior Plan)). Davis asserts that she was under the impression that the meeting was supposed to be "about Lindemann's conduct and resolving the unfair treatment of E.D." (ECF No. 65 ¶ 86). The parties agree that Davis refused to participate in the RTII process. (*Id*. ¶ 87). Davis had filed a formal charge of discrimination with the PHRA the day before (February 26, 2012), and informed school officials that she did so during the meeting. (*Id*. ¶¶ 91, 130).

The parties agree that Lindeman started keeping a daily chart of E.D.'s behaviors. (*Id*. ¶ 92). Lindemann and Mellett testified that he kept the chart because E.D.'s bad behavior continued and they wanted to help E.D. make better choices, a contention Davis denies. (*Id*.; 49 at 136 (Lindemann Depo. at 52:15-17); 49-1 at 196 (Mellett Depo. at 96:20-23)). Lindemann requested that the school assign another teacher to his classroom to help with E.D. (ECF No. 65 ¶ 97). According to defendants, the purpose of this request was so that there would be a second person in the room to help deal with E.D. when he became disruptive while Lindemann continued instruction and to help document E.D.'s behaviors. (*Id*.; 49 at 153 (Lindemann Depo. at 119:23-120:12); 49-2 at 406 (Email); 54 at 613 (Email)). Lindemann's request was granted and Nathan Pease ("Pease"), a certified teacher who was working as a full-time substitute at the time, was assigned to Lindemann's classroom as a co-teacher. (ECF No. 65 ¶ 98).

Pease testified that E.D. frequently exhibited misbehavior similar to that which Lindemann described, some of it every day. (ECF No. 49-1 at 277, 280-81, 286 (Pease Depo. at 25:4-19, 34:19-35:10, 39:19-22, 60:14-61:10)). This behavior included: yelling; running; throwing, shoving, and slamming things; throwing papers in Pease's face; pushing and kicking

other students; and making fun of other students.  (*Id.*).

Mellett testified that students are removed from the classroom when their behaver becomes physical or highly disruptive.  (ECF Nos. 65 ¶ 102; 49-1 at 180 (Mellett Depo. at 31:1-9)).  Sometimes Lindemann or Pease would remove E.D. from the classroom and take him into the hall.  (ECF No. 65 ¶ 103).  Defendants aver that this occurred when E.D.'s behavior "escalated or became aggressive" in order to maintain a safe environment and allow instruction to continue; Davis denies that her son's behavior was as severe as defendants describe.  (*Id.*).  School officials testified that once in the hall, Pease or Lindemann would first try and calm down E.D. and if unsuccessful, the teacher would escort him to either the office or the work away room.  (ECF Nos. 65 ¶¶ 103-104; 49 at 156 (Lindemann Depo. at 130:3-131:25); 49-1 at 280 (Pease Depo. at 37:8-25)).  The work away room is a small, empty, white room on the second floor.  (ECF No. 65 ¶ 141).  The teacher would leave E.D. alone in the work away room to do work by himself until he relaxed, while the teacher waited outside.  (ECF Nos. 65 ¶ 104; 49-1 at 280-81 (Pease Depo. at 37:8-38:25)).  E.D. and Pease's accounts differ on how long E.D. would be in the work away room at a time, with Pease estimating generally five to ten minutes and E.D. estimating thirty minutes to an hour.  (ECF Nos. 65 ¶ 104; 49 at 117 (E.D. Depo. at 58:18-23); 49-1 at 281 (Pease Depo. at 38:16-17)).

Throughout February and March 2012, Davis continued to complain to the school that she felt E.D. was being unfairly treated.  (ECF No. 65 ¶¶ 127-28, 134-36).  Some of her complaints specifically referenced E.D.'s civil rights and, by March 2012, that Davis felt the discrimination was racially grounded.  (*Id.*).

E.D. was suspended in May 2012, although the parties disagree about whether his

conduct warranted out-of-school suspension. (ECF No. 65 ¶ 107). The parties agree that the school district's disciplinary code of conduct imposes different levels of discipline depending upon the behavior and specifically provides that the discipline may vary if the student has prior offenses. (*Id*. ¶ 106).

### B. **D.I. and Other Potential Comparators**

Another student in Lindemann's second grade class, D.I., exhibited notable behavioral problems. D.I. is Caucasian (ECF No. 65 ¶ 14). D.I. attended the same program at the YMCA as E.D. and rode the same bus from there to the school. (*Id*.). D.I. and E.D. often came into conflict both at the YMCA and the school. (*Id*.). Mellett testified that D.I. "had his share of challenges behaviorally . . . sometimes he was the instigator and sometimes he was the instigatee." (ECF Nos. 65 ¶ 14, 16; 49-1 at 210 (Mellett Depo. at 150:5-11)). Discipline records cite D.I. for seven instances of misconduct from February 8, 2011, to March 30, 2012. The records include several entries for "inappropriate bus behavior"; grabbing a girl's hood and moving his hand up and down such that it looked like he was hitting her; and slapping another student in the face, for which he received half a day of in-school suspension. (ECF No. 49-2 at 329 (D.I. PowerSchool Records)). Defendants characterize D.I.'s mother as cooperative and wanting to help the school improve her son's behavior. (EFC No. 65 ¶ 17). Davis does not dispute this characterization per se, but asserts that the real difference between D.I.'s mother and her was that D.I.'s mother did not challenge the school's conduct. (*Id*.). Defendants contend that D.I.'s mother consented to RTII process, but, as Davis points out, the record is ambiguous with respect to this point. (*Id*. ¶ 18).

Davis refers to isolated instances of other students misbehaving without punishment.

(*See* ECF No. 65 ¶¶ 142-78). For example, Davis emailed Mellett to report that another student, G.M., kicked his pencil sharpener without receiving any sort of discipline. (ECF Nos. 65 ¶¶ 148; 49-2 at 384-85 (Davis Email)). The accounts of most of these incidents come from either Davis's notes, that were submitted to the PHRC, or emails she sent to school officials. The court will discuss these alleged incidents in the discussion section.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. *Id.* at 248–49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. *Liberty Lobby,* 477 U.S. at 255; *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir.2007); *Woodside v. Sch. Dist. of Phila. Bd. of Educ.,* 248 F.3d 129, 130 (3d Cir.2001); *Doe v. Cnty. of Centre, PA,* 242 F.3d 437, 446 (3d Cir.2001); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 151 (3d Cir.1999). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n. 3 (3d Cir.1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Liberty Lobby,* 477 U.S. at 248–49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. *Celotex,* 477 U.S. at 323; *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080 (3d Cir.1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir.2007) (citing *Celotex,* 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. *Celotex,* 477 U.S. at 322–23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P.

56(e); *see Liberty Lobby,* 477 U.S. at 247–48; *Celotex,* 477 U.S. at 323–25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. *Liberty Lobby,* 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner,* 247 F.App'x 353, 354 (3d Cir.2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002)).

## IV.  DISCUSSION

Davis argues that many of the same actions on the part of defendants constituted both discrimination and retaliation. (ECF No. 55 at 10, 22 (Pl.'s Brief)). While the court will address the two sets of claims in turn, much of the discussion applies to both the discrimination and retaliation claims. Likewise, there is significant overlap between Davis's own claims and those she brings on behalf of E.D.

### A.  Spoliation

The court must first address Davis's claims of spoliation by defendants. Davis avers that "the evidence suggests that Lindemann destroyed" notes on D.I. that might have supported her claims. (ECF No. 55 at 23-24 (Pl.'s Brief)). As relief, Davis requests a spoliation inference that

defendants "should, at a minimum, be precluded or estopped from making claims that others (in particular D.I.) were not similarly situated to E.D." (*Id.*).

In order to establish spoliation, it must be shown that: (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party. *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir. 2012) (citation omitted). With respect to actual suppression of evidence, the Third Circuit Court of Appeals has clarified that a court must determine that the relevant actor suppressed or withheld the evidence in bad faith. *Id.* at 79. A finding of bad faith is therefore "pivotal" to a spoliation determination. *Id.* The party who seeks spoliation sanctions bears the burden of proving these elements. *Flanders v. Dzugan*, No. CIV.A. 12-1481, 2015 WL 5022734, at *4 (W.D. Pa. Aug. 24, 2015) (collecting decisions).

Davis's allegations of spoliation appear to be based on a portion of Lindemann's deposition testimony that he "probably had handwritten notes" on D.I. prior to his entry in the RTII process but does not have them now and does not know what happened to them. (ECF Nos. 49 at 168 (Lindemann Depo. at 179:4-14); 66 at 6 n. 4 (Pl.'s Sur-reply Brief)). Davis did not file a spoliation motion; she simply touches upon the issue fleetingly in her briefs. In doing so, she failed to adequately set forth sufficient evidence to support all the required elements. Most obviously, Davis did not point to evidence sufficient to show bad faith. That Lindeman does not know what happened to notes that "probably" existed does not by itself demonstrate bad faith. *See e.g.*, *Flanders*, 2015 WL 5022734, at *5-6 (failure to institute a litigation hold without a showing of bad faith not sufficient despite foreseeability of litigation); *Bozic v. City of*

*Washington*, 912 F.Supp.2d 257, 270 (W.D. Pa. 2012) (finding spoliation sanctions warranted where the party's conduct "rises well above inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living, any of which arguably fall outside of the spoliation definition set forth in *Bull*.").  Accordingly, the court cannot grant Davis's request for a spoliation inference.

## B.  Title VI Claims

Title VI provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The statute's prohibition on race-based discrimination in any program that receives federal funding includes public schools.  *See e.g.*, *Gazarox ex rel. Gazarov v. Diocese of Erie*, 80 F.App'x 202, 204-05 (3d Cir. 2003).  Here, there appears to be no dispute that QVSD receives federal funds and is subject to Title VI.[5]  There was no direct evidence of discrimination presented and this discussion will focus on circumstantial evidence of discrimination.  Race discrimination claims under Title VI based upon circumstantial evidence are analyzed using the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6]  *Gazarox*, 80 F.App'x  at 204-05.

### i.  E.D.'s Title VI Discrimination Claim

The *McDonnell Douglas* framework calls for a three-step, burden-shifting analysis.  The

---

[5]  The Title VI claims are asserted only against QVSD because there is no individual liability under Title VI. *Whitfield v. Notre Dame Middle School*, 412 F.App'x 517, 521 (3d Cir. 2011).

[6]  Davis's other claims are also analyzed using the *McDonnell Douglas* burden-shifting framework.  *See Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (*McDonnell Douglas* framework applies to race discrimination claims under § 1981 and the PHRA); *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) (framework applicable for race discrimination claims under § 1983).

plaintiff has the initial burden to establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. After the plaintiff establishes a prima facie case for discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Id.* For the defendant to carry this burden, the defendant must "clearly set forth" a nondiscriminatory reason. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 (1981). If the defendant meets this burden, the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext of discrimination." *Id.* at 253 (citing *McDonnell Douglas*, 411 U.S. at 804).

The precise formulation of the requirements for a prima facie showing of discrimination varies slightly by context, but the gist is the same, with only slight variations in the second prong. In the education context, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified to continue in pursuit of his education; (3) he suffered an adverse action; and (4) the circumstances of the adverse action give rise to an inference of unlawful discrimination.[7] *See e.g.*, *Ke v. Drexel Univ.*, No. CIV.A. 11-6708, 2015 WL 5316492, at *17 (E.D. Pa. Sept. 4, 2015) (citing *Bell v. Ohio State Univ.*, 351 F.3d 240, 252-53 (6th Cir. 2003)); *Hart v. Univ. of Pittsburgh*, No. CIV.A. 13-399, 2014 WL 4218616, at *12-13 (W.D. Pa. Aug. 25, 2014). The fourth prong can be established by showing that similarly situated individuals who were not members of the protected class were more favorably treated than the plaintiff. *See e.g.*, *Nguyen v. AK Steel Corp.*, 735 F.Supp.2d 346, 361 (W.D. Pa. 2010) (citing *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)).

---

[7] In a nonprecedential opinion, the Third Circuit Court of Appeals acknowledged that it had not yet adapted the *McDonnell Douglas* prima facie test for the educational context. *See Manning v. Temple Univ.*, 157 F.App'x 509, 513 (3d Cir. 2005). However, the court of appeals analyzed the plaintiff's claims under the test and explained that "under any rendering of the test, [plaintiff] fails to raise the required inference of discrimination . . . ." *Id.*

If a plaintiff can establish a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for its action. The burden of production is light. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (citation in the original).

If the defendants meet their burden of production by showing a legitimate, nondiscriminatory reason for the challenged action, the burden shifts to the plaintiff to demonstrate that the defendants' alleged reasons are a pretext for discrimination. *Burdine*, 450 U.S. at 253. For the plaintiff to meet this burden, the plaintiff must show "'*both* that the reason was false, *and* that discrimination was the real reason.'" *Fuentes*, 32 F.3d at 763 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). To survive a motion for summary judgment, a plaintiff must satisfy at least one of the two prongs formulated by the United States Court of Appeals for the Third Circuit in *Fuentes*:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* at 764.

### a) <u>Prima Facie Case</u>

There is no doubt that Davis satisfied the first three steps of a prima facie case of discrimination on behalf of her son. As an African American, E.D. is a member of a protected class. All parties agree that E.D. received significant discipline while in the second grade; therefore, he suffered an adverse action. Likewise, there appears to be no claim that E.D. was unqualified in any sense. The remainder of the discussion, with respect to plaintiff's burden of

establishing a prima facie case, will address the fourth prong of the test.

To reiterate, Davis on behalf of E.D. must establish that the circumstances of the adverse action give rise to an inference of unlawful discrimination in order to satisfy the fourth prong. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. To satisfy this burden, Davis argues that the school district treated similarly situated students outside the protected class more favorably than E.D. by disciplining those students less harshly for similar conduct. (ECF No. 55 at 8-10, 22-23 (Pl.'s Brief)).

To be valid comparators, individuals need not be "identically situated," but they must be similar in "'all relevant respects.'" *Opsatnik v. Norfolk S. Corp.,* 335 F.App'x 220, 223 (3d Cir. 2009) (quoting *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)). In determining whether employees are similarly situated, the court is required to undertake "a fact-intensive inquiry based on a whole constellation of factors." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 306 (3d Cir. 2004) (interpreting New Jersey antidiscrimination law). When dealing with discipline in the employment context, this court recently discussed a split of authority about whether the conduct for which the plaintiff was disciplined must be "the same" or only "similar conduct." *See Mitchell v. City of Pittsburgh*, 995 F.Supp.2d 420, 431 n. 3 (W.D. Pa. 2014) (collecting decisions). This court concluded that the prevailing standard within the Third Circuit is the latter, that comparators must have engaged in "similar conduct." *Id*. The court will proceed with that standard here. The Third Circuit Court of Appeals has noted that in the context of school discipline, the ultimate question remains similarity, and that even more serious conduct is "irrelevant" unless it is similar. *Gazarov*, 80 F.App'x at 206 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Davis argues that all of E.D.'s Caucasian classmates, and particularly D.I., can serve as comparators. (ECF No. 55 at 8-10, 22-23 (Pl.'s Brief)). The record clearly supports her contention that E.D. was treated differently than his classmates, in that Lindemann and Pease removed him from the classroom more often, took him to the work away room, and documented his behavior to a higher degree than that of the other students. Whether the record contains evidence that the other students were similarly situated to E.D. is another matter.

Courts generally afford schools wide discretion with respect to disciplinary decisions. *See Z.H. ex rel. Berish v. Penn Hills Sch. Dist.*, No. CIV.A. 12-1696, 2013 WL 300753, at *7 (W.D. Pa. Jan. 25, 2013) ("Keeping in mind that 'courts are to refrain from second-guessing school administrators' disciplinary decisions") (quoting *C.S. v. Couch*, 843 F.Supp.2d 894, 910 (N.D. Ind. 2011)); *DT v. Somers Cent. Sch. Dist.*, 588 F.Supp.2d 485, 496 (S.D.N.Y. 2008), *aff'd sub nom.*, *DT v. Somers Cent. Sch. Dist.*, 348 F.App'x 697 (2d Cir. 2009) ("courts have been skeptical of arguments premised on the degree to which a school punishes its students . . . . The Supreme Court further recognized that '[s]chool administrators will continue to enjoy the flexibility they require' and that 'courts should refrain from second-guessing the disciplinary decisions made by school administrators.'") (quoting *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999)). Perhaps tellingly, there is remarkably little case law on the topic. Much of the case law involves either cases where the student received an expulsion or long-term suspension or cases where the student's claim against school administrators could be characterized more as a failure to remedy a hostile environment created by other students. When a parent and student, like in this case, ask a court to parse disciplinary decisions and misbehavior which involve, at worst (and for most of the disciplinary decisions

less than) suspension and not expulsion, the caution to avoid second-guessing a school's disciplinary decisions is implicated.

Davis's argument regarding E.D.'s behaviors has two components: (1) E.D. did not always do the things that the school accused him of doing; and (2) when E.D. did misbehave, it was in ways that were typical of second graders, including his classmates, who received lesser discipline and scrutiny for the same behaviors. To the extent Davis argues that there is a material dispute of fact about whether defendants grossly mischaracterize E.D.'s behavioral problems, the court finds the record does not support that argument. The only suggestions in the record that E.D. never or barely misbehaved are E.D.'s and Davis's claims that the school would often accuse him of things he did not do. The record, however, does not reflect a material dispute of fact about those denials. Davis's denials are not based on any personal knowledge.[8] *See* (ECF No. 49 at 52 (Davis Depo. at 202:3-21)) (admitting she was never present during any of the times school officials claim E.D. misbehaved); *see also Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) ("Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment."). E.D.'s deposition testimony is vague and equivocal. At best, E.D. testimony can be characterized as asserting that while he was not perfect, he was *sometimes* accused of doing things he did not do. (*See id*. at 117-19 120 (E.D. Depo. at 58:12-15, 65:1-14, 66:10-23, 72:21-73:8)). E.D. does not dispute that he sometimes did the things of which he was accused, and he did not specify what things he did not do. Here, the record reflects not a relatively small number of specific incidents, but a large number of relatively minor, and often unspecified incidents.

---

[8] Hearsay is inadmissible and cannot be relied upon in the summary judgment context to create a triable issue of material fact. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

The court concludes that a reasonable jury on this record could not find E.D. never misbehaved or that he was often accused of things he did not do.

The argument Davis advances more forcefully is that other students engaged in, but were not as severely disciplined for, the same kinds of behavior as E.D. The court will discuss D.I. first and then the rest of E.D.'s Caucasian classmates, but notes that the arguments and analysis overlap.

While Davis's filings focus on D.I.'s behaviors, there is actually very little concrete information in the record regarding the precise nature of D.I.'s behavioral problems or the school's handling and disciplinary response.[9] E.D. testified that D.I. was "a student in our class who pushed me and liked to start trouble with me and bothered me during class." (ECF No. 49 at 115 (E.D. Depo. at 51:7-10)). E.D. recounts very few, if any, specific incidents where D.I. misbehaved. (*See generally id.*). During one of her visits to the classroom, Davis witnessed D.I. "falling out on the floor" "crying" and being "deeply upset." (ECF No. 49 at 84 (Davis Depo. at 106:3-13)). She does not mention what caused this incident or what, if any, reaction it garnered from Lindemann. There are a few other points in the record where Davis reports vague incidents of misbehavior by D.I., either in her own notes which she sent to the PHRC, or in emails she sent to school officials. (*See* ECF No. 65 ¶¶ 142, 149, 152). However, these descriptions are clearly not based upon Davis's personal knowledge and are lacking in detail. *See Olympic Junior, Inc.*, 463 F.2d at 1146. The best evidence of D.I.'s behavior comes from the one page of PowerSchool records. (ECF No. 49-2 at 329 (D.I. PowerSchool Records)). As already described, these discipline records contain seven entries of bad behavior from February 8, 2011

---

[9] As already discussed, the court did not find a sufficient basis for granting a spoliation inference "estopp[ing] [defendants] from making claims that others (in particular D.I.) were not similarly situated to E.D." *See* (ECF No. 55 at 23-24 (Pl.'s Brief)).

through March 30, 2012, including several entries for "inappropriate bus behavior"; grabbing a girl's hood and moving his hand up and down such that it looked like he was hitting her; and slapping another student in the face, for which he received half a day of in-school suspension. (*Id*.). The court notes that two of the seven entries would have occurred during the prior school year to the one in question, including the incident where D.I. grabbed the girl's hood. (*Id*.). All five of the entries for the relevant school year reference behaviors which occurred on the bus, and not in Lindemann's classroom. (*Id*.).

Defendants do not dispute that D.I. had behavioral problems. (ECF Nos. 65 ¶¶ 14, 16; 49-1 at 210 (Mellett Depo. at 150:5-11)). But what little information there is about D.I.'s behavioral problems does not establish that his behaviors were similar to E.D.'s behaviors. What defendants claim set E.D. apart was not any specific action, but the fact that while other students occasionally engaged in some of the same behaviors as E.D., no other student did so with the same frequency or intensity. (ECF Nos. 47 at 19 (Defs.' Brief); 65 ¶ 31; 49 at 134, 139, 166 (Lindemann Depo. at 45:5-6, 64:9-66:5, 170:1-171:2)). Davis would have to demonstrate that D.I.'s behavioral problems occurred with similar frequency and intensity to E.D.'s behavioral problems in order for D.I. to serve as a comparator. *See Simpson*, 142 F.3d at 647 ("In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the [defendant] as the reason for the adverse action."); *see also Paich v. Nike, Inc.*, No. CIV.A. 06-1442, 2008 WL 696915, at *10 (W.D. Pa. March 12, 2008) (other employees not comparators where no other employee had been the subject of a comparable quantity of complaints); *Schwoebel v. Catholic Diocese of Pittsburgh*, No. CIV.A. 06-533, 2007

WL 4302097, at *5 (W.D. Pa. Dec. 6, 2007) (same). At best, the record demonstrates that both students had behavioral problems. Nothing in the record indicates that the frequency and intensity of D.I.'s behavioral problems matched those of E.D., and there are no references to D.I. engaging in many of the specific kinds of behavior defendants attribute to E.D. The parties agree that the school district's disciplinary code imposes different levels of discipline depending upon the behavior and specifically provides that the discipline may vary if the student has prior offenses. (ECF No. 65 ¶ 106). It makes no difference that Davis may take the position that some of D.I.'s behaviors were more serious than some of E.D.'s behaviors. *See Gazarov*, 80 F.App'x at 206. Thus, Davis did not adduce sufficient evidence for a reasonable jury to conclude that their misbehaviors was similar in "all relevant respects."[10]

Davis's attempt to make comparators out of the rest of E.D.'s classmates fairs no better. Once again, she relies on vague references to isolated instances where other students allegedly misbehaved. (*See* ECF No. 65 ¶¶ 142, 146-48, 150-53, 155-57). For example, Davis claimed in her notes to the PHRC that another student, J.F.K. pushed E.D. and other students were running and climbing around the front office area without being reprimanded. (*Id*. ¶ 153). In another incident, Davis witnessed an unnamed student running around "out of control" in front of the school. (*Id*. ¶ 157). Davis's testimony contains no information regarding the grade level or class of the student, or any indication that this particular student was involved in any of the other incidents she alleges took place.

These incidents fail to establish the fourth prong for the same reasons as the evidence

---

[10] The court highlights that it reached this conclusion without considering defendants' further argument that D.I. and E.D. are not similarly situated because D.I.'s mother consented to the RTII process. (*See* ECF No. 47 at 21-22 (Defs.' Brief)). Since the record is ambiguous as to that point, (ECF No. 65 ¶ 18), the court gives plaintiff, as the nonmoving party, the benefit of the doubt and will not consider that evidence.

concerning D.I.  The majority of the incidents are not based on Davis's personal knowledge and they are unspecific and isolated events which fail to establish that any other student engaged in behaviors similar to E.D.'s behaviors; i.e., with comparable frequency and intensity.  The relatively few incidents mentioned are split among four students whom Davis can name and a number of others whom she cannot identify.  Several of these incidents did not occur in Lindemann's classroom.  In order for another student to be similarly situated to E.D., Davis would have to show that the student's behavioral problems were similar to E.D.'s behavioral problems.  Even if the court found all the alleged incidents of other students misbehaving to be supported by evidence, which it cannot, that evidence is insufficient because Davis may not create a comparator by combining all the bad behaviors of half a dozen other students that are each alone insufficient.

After viewing all evidence in the light most favorable to Davis on behalf of E.D., the court concludes that there is insufficient evidence to permit a reasonable fact finder to find that D.I. or any other student was similarly situated to E.D. in all relevant respects.  Accordingly, Davis on behalf of E.D. cannot establish a prima facie case of discrimination against E.D. and defendants are entitled to summary judgment on these claims.  The court will nevertheless, in the interest of completeness, proceed to a discussion of the third and fourth steps of the burden-shifting framework.

### b)  Legitimate, Nondiscriminatory Reasons

If Davis had established a prima facie case on behalf of E.D., defendants would then have to articulate a legitimate, nondiscriminatory reason for their actions.  The burden of production is light.  "The [defendant] need not prove that the tendered reason *actually* motivated its behavior,

as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763. Defendants allege that their actions were justified by E.D.'s frequent, intense, and disruptive behavior. (ECF No. 47 at 21-22 (Defs.' Brief)). Specifically, Lindemann and Pease removed E.D. from the classroom when he was disrupting the learning environment, and documented his behaviors because they needed to be "more mindful" of what he was doing in the classroom and so they could help him and maintain an orderly learning environment. (*Id*.). Undoubtedly, significant misbehavior in the classroom is a legitimate, nondiscriminatory reason for disciplining a student. The school has met its burden of "explaining clearly the nondiscriminatory reason . . . for its action." *Burdine*, 450 U.S. at 260.

### c) Pretext

Because defendants met their burden of production by showing a legitimate, nondiscriminatory reason for their actions, and if Davis had established a prima facie case on behalf of E.D., the burden would shift to Davis to demonstrate that the school district's alleged reasons are pretext for discrimination. *Id*. For Davis to meet this burden, she must show "'both that the reason was false, *and* that discrimination was the real reason.'" *Fuentes*, 32 F.3d at 763 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742). A plaintiff may satisfy this burden and survive a motion for summary judgment by producing direct or circumstantial evidence that would allow a factfinder to reasonably either: (1) "disbelieve the [defendant's] articulated legitimate reasons"; or (2) "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action." *Id*. at 764. The court will discuss each prong.

To satisfy the first prong of the pretext analysis, "the non-moving plaintiff must demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes,* 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff may not "'simply show that the [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108–09 (3d Cir.1997) (quoting *Fuentes,* 32 F.3d at 765). A plaintiff need not necessarily, however, produce additional evidence beyond that required by the prima facie case. *Fuentes*, 32 F.3d at 764.

Davis points to a number of purported inconsistencies in the record which she argues undermine the legitimate reasons proffered by defendants. First, she argues that E.D.'s misbehaviors were actually oppositional behaviors provoked by Lindemann's efforts to discipline E.D. and document E.D.'s behaviors. (ECF No. 55 at 25-26 (Pl.'s Brief)). She casts this as "the proverbial 'which came first, the chicken or egg' question" and argues it is a factual dispute. (*Id.*) ("[a] jury could believe that Lindemann's [sic] himself became the problem and that he literally went to war with E.D., a seven year old child."). However, Davis did not come forward with any evidence to substantiate this theory that alleged mistreatment by Lindemann provoked oppositional misbehaviors from E.D. Even E.D.'s deposition testimony fails to support that argument. While E.D. testified he was accused of doing things he did not do, he did not testify that he ever purposefully misbehaved as a means of opposing unfair treatment by

Lindemann.

Next, Davis points to a handful of statements made by school officials that suggest positive reinforcement and incentives are often preferable to punitive discipline as a means of controlling behavior. (ECF Nos. 55 at 27-28 (Pl.'s Brief); 65 ¶ 71). Davis seems to argue that Lindemann's punitive discipline of E.D. was inconsistent with QVSD's disciplinary philosophy and a pretext for his discriminatory intent. None of the statements cited in any way, however, suggest that discipline should never be used, only that positive reinforcement is generally a preferred starting point.[11] Davis's reaching attempt to characterize Pease's testimony, (ECF No. 55 at 28 (Pl.'s Brief)), as suggesting an opinion that positive reinforcement might have worked on some of E.D.'s behaviors is unavailing.

Davis cites to partial statements made by various school officials that describe E.D. in positive terms or note occasional good or neutral behaviors. (*See e.g.*, ECF No. 65 ¶¶ 39, 99, 108-11, 173, 175). Those snippets appear to be offered as proof that school officials did not actually think E.D.'s behavioral problems were as bad as they claim. (ECF No. 55 at 29 (Pl.'s Brief)) ("perhaps most profoundly, there is a conflict of evidence about what kind of person seven year old E.D. was."). As an initial matter, the full statements from which Davis selectively quotes plainly indicate that while E.D. is not a bad kid, school officials had concerns about his behaviors. More importantly, defendants do not take the position that E.D. was a categorically

---

[11] This theme reoccurs in Davis's arguments. Davis often quotes various statements in the record and proceeds to draw inferences that simply are not there. For example, she repeatedly quotes an entry in Lindemann's reflection journal where he writes: "it seems risky to bribe him carrots for some fairly basic behaviors necessary for positive interaction. He's expecting more attention than one gets within a group. There needs to be more a powerful negative consequence on the other side (could be a more timely removal)." (ECF Nos. 65 ¶¶ 19, 71; 54 at 599 (Lindemann Reflection Journal)). Contrary to Davis's assertion, those statements do not prove that Lindemann's discipline of E.D. was somehow improper simply because he sought to use negative reinforcement in addition to positive reinforcement. If anything, this entry further elucidates defendants' nondiscriminatory reasons for using both positive and negative reinforcement in dealing with E.D.'s behavior.

terrible person. They explain that their treatment of E.D. was an appropriate response to serious behavioral problems. Lindemann's reference to E.D. as "an awesome student" and Mellett's statement that she did not think E.D. was a "bad person" are not inconsistent with their claims that he had severe behavioral problems, and are insufficient evidence to allow a reasonable jury to find pretext.

None of these alleged "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" are sufficient to undermine defendants' proffered nondiscriminatory reasons. With regard to the first prong from *Fuentes*, Davis failed to demonstrate that a factfinder could reasonably disbelieve defendants' articulated legitimate reasons.

The court is next required to examine the second prong of the *Fuentes* framework to determine if Davis presented sufficient evidence of pretext. This prong permits a plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. The kinds of evidence relied upon by the court of appeals under this prong of the *Fuentes* analysis are: 1) whether the defendant previously discriminated against the plaintiff; 2) whether the defendant has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the defendant has treated more favorably similarly situated persons not within the protected class. *Simpson*, 142 F.3d at 644-45. The court will examine whether Davis on behalf of E.D. submitted any of those kinds of evidence.

The record contains no evidence relevant to the first two kinds of evidence. The only argument made by Davis that goes to this second prong is that similarly situated students outside

E.D.'s protected class were differently treated.  As already discussed in detail in the prima facie case analysis, Davis failed to identify any comparators.  On this record, a reasonable factfinder could not find that D.I. or any other student engaged in conduct similar to E.D.  Thus, Davis on behalf of E.D. cannot satisfy either prong for demonstrating pretext.

Since Davis on behalf of E.D. failed to adduce sufficient evidence to establish a prima facie case, and even if she had, defendants articulated a legitimate, nondiscriminatory reason for their actions and Davis on behalf of E.D. failed to adduce sufficient evidence to establish pretext, defendants' motion for summary judgment will be granted with respect to the Title VI discrimination claim asserted on behalf of E.D. and judgment will be entered in favor of QVSD on this claim.

### ii.    E.D.'s Title VI Retaliation Claim

In order to establish a prima facie case of retaliation under Title VI a plaintiff must show: (1) she was engaging in a protected activity; (2) she suffered an adverse action; and (3) a causal link existed between the adverse action and the protected activity.  *Whitfield v. Notre Dame Middle School*, 412 F.App'x 517, 522 (3d Cir. 2011).  If the plaintiff can establish this prima facie case, the *McDonnell Douglas* burden-shifting applies.[12]  *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).

With respect to the causal connection element of the prima facie case, the court may consider "a broad array of evidence."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).  Unusually suggestive temporal proximity between protected activity and adverse

---

[12] Once again, the court notes that all of Davis's claims are analyzed under the *McDonnell Douglas* burden-shifting framework and that there is significant overlap between the claims brought by Davis on behalf of herself and those brought on behalf of E.D., as well as significant overlap between the facts (and thus the analysis) relating to the discrimination claims and the retaliation claims.

action may be sufficient on its own to create an inference of causality. *Id.* at 280; *see Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001). However, "the mere fact that adverse [] action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds, *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 61 (2006). If the temporal proximity is not unusually suggestive, a court may consider whether the record evidence, as a whole, is sufficient to raise an inference of causation, and in doing so may consider evidence of ongoing antagonism or retaliatory animus, inconsistencies in the defendant's articulated reasons for taking the adverse action, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Farrell,* 206 F.3d at 280.

All the retaliation claims – those that Davis brings on behalf of herself and those she brings on behalf of her son – appear to be premised on the same protected conduct, i.e., her various complaints to school officials that they were not fairly treating her son. (*See* ECF No. 55 at 10-15 (Pl.'s Brief)). The Supreme Court of the United States has held that an individual may sue for retaliation under Title VII relying on the protected conduct of another individual. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011); *see Antonelli v. Sapa Extrusions Inc.*, No. CIV.A. 14-2184, 2015 WL 365683, at *2-4 (M.D. Pa. Jan. 27, 2015). The Third Circuit Court of Appeals has applied that reasoning to retaliation claims brought under § 1983. *Montone v. City of Jersey City*, 709 F.3d 181, 197-98 (3d Cir. 2013). Because retaliation claims under Title VI and § 1981 are generally treated the same as retaliation claims under Title VII and § 1983, *see Whitfield*, 412 F.App'x at 522; *Estate of Olivia ex rel. McHugh*, 604 F.3d at 798;

*Moore*, 461 F.3d at 342, this court predicts the court of appeals would likewise allow a plaintiff to sue under Title VI and § 1981 for retaliation resulting from the protected activity of another individual. Accordingly, the court will recognize that Davis's protected activity satisfies the first prong of the retaliation claims brought on behalf of E.D.

There is no doubt Davis engaged in protected activity. On February 16, 2012, Davis copied Lindemann on her email to an attorney regarding a potential lawsuit. (ECF No. 65 ¶ 64). At least as early as February 21 and 22, 2012, she mentioned that she felt E.D.'s "civil rights" were being violated. (ECF No. 54 at 614-15 (Faulkner Notes and Mellett Email)). On February 27, 2012, Davis informed defendants that she had filed a charge with the PHRC the day before, and the parties agree she had threatened to file a charge even earlier. (ECF No. 65 ¶¶ 45, 91, 130). However, the parties dispute when the protected activity started. Davis argues that the "onset of that [expressive] activity began as early as October 2011" when she began voicing concerns about how the school was treating E.D. (ECF No. 55 at 10 (Pl.'s Brief)). Defendants argue that Davis's early complaints made no reference to race. (ECF No. 47 at 29-30 (Defs.' Brief)). It is true that the earliest complaints do not mention race or civil rights. (*See* ECF No. 49-2 at 325-26 (Email Exchange Between Mellett and Davis)). However, E.D. was the only African American student in his class and Ondek and Faulkner both testified that they suspected Davis's concerns involved race before she explicitly said so. (ECF No. 49-1 at 224-25, 261, 263-64 (Ondek Depo. at 49:23-50:12; Faulkner Depo. at 32:11-25, 41:10-42:3)). Given these facts, a reasonable jury could conclude that Davis's earlier complaints also constituted protected activity. The second prong is satisfied because E.D. suffered an adverse action when he received significant discipline.

Davis's argument regarding the third prong – causal connection – is rather disjointed, but seems to have two components: (1) there was close temporal proximity between her complaints and the school's increasingly serious discipline of E.D.; and (2) "[t]he record clearly establishes that Davis's expressive activity upset both Lindemann and Mellett, and in fact, the entire QVSD hierarchy." (ECF No. 55 at 15-22 (Pl.'s Brief)) ("While Lindemann claims to have neutral reasons for maintaining the reflection journal, those reasons become suspect, when one considers the effect of Ms. Davis [sic] expressive activities on him").

Regarding the latter component, Davis tries to fashion retaliatory intent out of a showing that defendants felt harassed by her actions and were worried about a potential lawsuit. (*Id.* at 15-17). However, Davis fails to point to anything in the record that ties these fears and feelings to any change in the treatment of her son. That QVSD officials worried about a lawsuit, or that Lindemann, a second-grade school teacher, felt harassed by what Davis herself describes as "an intense campaign in support of her son," is insufficient to establish that they desired to, or actually did, retaliate. Fear of a lawsuit is an unavoidable consequence of threatening to file one. It would be nonsensical to allow a plaintiff to make out a retaliation claim simply by showing her protected conduct worried the defendants. Evidence that defendants feared a lawsuit may be relevant in some retaliation cases, but it is not a substitute for evidence sufficient to show retaliatory intent.

Turning to the timing, "an undeniably short period of time" between the protected activity and adverse action, standing alone, is not necessarily probative of retaliatory animus. *See Kahan v. Slippery Rock Univ. of Pa.*, 50 F.Supp.3d 667, 702-03 (W.D. Pa. 2014), reconsideration denied sub nom., 2014 WL 7015735 (W.D. Pa. Dec. 11, 2014) (three weeks

between the two events).  While it is true that some of Davis's many complaints coincided generally with some instances of the school's frequent discipline of E.D., there is no evidence causally linking Davis's protected activity to the actions defendants took with respect to E.D. Davis primarily takes issue with Lindemann's documenting her son's behavior in the reflection journal and Lindemann's and Pease's repeated removal of E.D. from the classroom.  According to Davis, Lindemann began the reflection journal on February 1, 2012.  (ECF Nos. 55 at 15 (Pl.'s Brief); 65 at ¶¶ 73, 93, 115-16).  However, Davis argues that she began complaining about the treatment of her son in October 2011.  (ECF No. 55 at 10 (Pl.'s Brief)).  That Lindemann started the reflection journal four months later is not especially probative of retaliatory animus. Although Davis argues that her complaints ramped up in "late January," many of the examples she cites occurred *after* February 1, 2012.  (*See id*. at 11-15).  Nevertheless, she did complain to Mellett about Lindemann on January 25, 2012.  (ECF No. 54 at 568-69 (Davis Notes)).  Davis mainly points to the January 30, 2012 conversation in which she informed Lindemann that she had a problem with him and would no longer speak to him about E.D.  (*See* ECF No. 65 ¶¶ 41-42, 114).  The parties agree this conversation marked a change in the relationship between Davis and Lindemann.  (*Id*.).  In relying on this statement as the cause of Lindemann's retaliation, Davis attempts to ignore the substance of it.  What differentiates this statement from the rest of her complaints is not that she said she had a problem with Lindemann, but that she no longer wished to speak to him about her son.  Defendants argue that "[b]ecause Davis would not discuss E.D.'s behavior with Lindemann but instead went to Dr. Mellett, Lindemann began documenting E.D.'s behavior and sending it to Dr. Mellett so she would know what was [sic] E.D. was doing and the responses and accommodations Lindemann was trying."  (ECF No. 59 at 6 (Defs.' Reply

Brief); *see also* 49 at 142-43 (Lindemann Depo. at 77:8-24, 81:15-82:5)).  It undercuts Davis's temporal proximity argument that Lindemann started the reflection journal immediately after the conversation in which Davis declared she would no longer speak to him, even though she had also complained about his treatment of her son before and afterwards.

Defendants' explanation for why he began keeping the reflection journal is reasonable. *See Fuentes*, 32 F.3d at 766 (finding in the employment context that "an employer which documents its reason for taking adverse employment actions can often be more suitably described as sensible than as devious.").  As already touched on with respect to E.D.'s discrimination claims and pretext, there is no evidence of record that defendants were motivated by discriminatory or retaliatory animus in their treatment of E.D.  The purported inconsistencies with the legitimate reasons offered by defendants are insufficient for a jury to render a verdict in favor of E.D. and Davis.  *See supra* at 31-33.  Davis failed to point to any comment by any defendant which suggests the reflection journal was an attempt to retaliate against E.D. for his mother's conduct.  Even if the court were to find persuasive Davis's argument regarding the close but contextually unremarkable chronology, she cannot show the causal connection necessary to establish pretext.

The retaliation claims fail with respect to the repeated removals of E.D. from the classroom for many of the same reasons.  It is not clear from the record exactly when the removals first started, but Mellett testified that E.D. was not removed very often in the fall of 2011, but was removed more often in January and February 2012.  (ECF No. 49-1 at 200 (Mellett Depo. at 111:20-23)).  Mellett testified that E.D. was not removed to the work away room specifically before at least February 23, 2012.  (*Id*. at 113:4-9).  These removals may have

taken place in the midst of Davis's many complaints, but she did not show the timing was "unusually suggestive," particularly given that her complaints started much earlier.

Davis cites emails between Lindemann and the school psychologist Leah Wells ("Wells"), which were sent on February 23, 2012. (ECF No. 54 at 617 (Email)). In that email exchange, Lindemann expressed concern about "an extreme increase in challenging behavior" from E.D. and noted that "[o]ur current plans are not as effective and mother has cut off communication so we're going to have to work in-house to find a way to make my class feel safe and for instruction to be productive." (*Id.*). Lindemann wrote "[w]e could also come up with a more consistent consequence structure that could remove [E.D.] from the class when he escalates in his response to redirection and/or engages in attention seeking behavior that draws from instruction and student learning." (*Id.*). Wells' response suggested that another person might be needed to accompany E.D. to the work away room. (*Id.*). Davis avers this situation "is what drove Lindemann and his Union to petition the administration to have another adult assigned to his class." (ECF No. 55 at 19 (Pl.'s Brief)). The school assigned Pease to assist in the classroom. (ECF No. 65 ¶ 98). Davis cites this email exchange as if it were some sort of smoking gun. There, however, is nothing in Lindemann's email exchange that creates the inference that retaliatory animus motivated his actions. His only reference to Davis is that she cut off communication.

In conclusion, even when the record is viewed in the light most favorable to Davis on behalf of E.D., she failed to adduce sufficient evidence to support a logical inference of retaliatory motive and cannot establish a prima facie case of retaliation. The court will enter judgment in favor of QVSD on E.D.'s Title VI retaliation claim.

### iii.    <u>Davis's Title VI Retaliation Claim</u>

Davis's retaliation claims on her own behalf fail for many of the same reasons as the other claims.  As already discussed, Davis's retaliation claims are based upon the same protected activity as the retaliation claims she brings on behalf of E.D.  (*See* ECF No. 55 at 10-15 (Pl.'s Brief)).  Since she did engage in protected activity, the first element of a retaliation claim is satisfied.  Regarding the adverse action prong, Davis's retaliation claims on behalf of herself are premised on allegations that defendants denied her access to the school and participation in school activities, "placed limits upon her ability to interact with staff," and "denied [her] the opportunity to participate in creating plans for E.D.'s education."  (ECF No. 34 ¶ 64, (Second Amend. Compl.)).  Of the three categories of adverse action alleged in the Second Amended Complaint, only one is even partially supported by the record – that school officials denied Davis access to the school and school activities.

The only thing in the record that could conceivably be construed as showing defendants "placed limits upon her ability to interact with staff" is the communications breakdown that occurred between Davis and Lindemann following their conversation on January 30, 2012.  (*See* ECF No. 65 ¶¶ 41-42, 114).  Davis stated that she "told Lindemann that she had problems with him and could not talk to him about E.D."  (*Id*. ¶ 114).  Under those circumstances, it was Davis's decision to deny Lindemann access to her and not vice versa.  There is no evidence of record to support Davis's allegation in the Second Amended Complaint that defendants denied her "the opportunity to participate in creating plans for E.D.'s education."  Davis was present at the February 27, 2012 meeting to discuss a behavioral plan for E.D.  (ECF Nos. 65 ¶¶ 85-86).  There is no other indication in the record that defendants denied her any other such opportunity.

The only thing that might qualify has an adverse action is defendants' refusal to allow Davis to conduct an additional classroom observation on February 10, 2012.[13] (ECF No. 65 ¶ 61). An adverse action for the purposes of a retaliation claim is an action that "well might have dissuaded a reasonable [plaintiff]" from continuing to engage in the protected activity. *Moore*, 461 F.3d at 347-48 (quoting *Burlington*, 540 U.S. at 68). It is not clear that defendants' refusal to allow Davis to perform a classroom observation of her son's second-grade class, particularly after having allowed her to perform one the day before, is sufficiently adverse to dissuade a reasonable person from engaging in the protected activity. However, for the sake of argument, the court will proceed under the assumption that the refusal to allow Davis to perform a second classroom observation constitutes an adverse action.

Davis does not fully explain her argument for how she has established the third prong of a prima facie case of retaliation, i.e., a causal connection, but it appears again to be a combination of close temporal proximity and a showing that defendants were concerned about a lawsuit and felt harassed by her conduct. (*See generally* ECF No. 55 at 15-18). No combination

---

[13] Davis claims defendants eventually barred her from any future classroom observations and all school activities. (ECF No. 55 at 18 (Pl.'s Brief)). These claims are unsupported by the record. To show that she was banned from school activities, Davis points to one instance where she "was denied the opportunity to serve as a chaperone on a field trip to the zoo, because Lindemann refused to enter in [sic] name into the drawing." (*Id.*). The full email exchange between Lindemann and a union representative, Elise Woodburn, on which she relies, however, plainly shows that Davis would be going on the zoo trip with E.D., just not as a chaperone who would supervise other children. (ECF No. 61 at 624 (Email Exchange)). Davis also cites to emails regarding an event called "field day." (*Id*. at 625-27). These emails likewise plainly indicate that Davis would be permitted to attend field day. (*Id.*). They only show that Davis would not be permitted to attend E.D.'s classes that day, but note that no parents would be doing so. (*Id.*). To support her contention that defendants eventually decided to prohibit her from doing classroom observations, Davis points to a February 23, 2012 email between Lindemann and Woodburn, wherein Woodburn references a conversation between the union and school administrators regarding the union's concerns about protecting Lindemann from Davis. (ECF Nos. 55 at 17; 49-2 at 403 (Woodburn Email)). In her email, Woodburn does report to Lindemann that Clapper indicated to the union that Davis would no longer be permitted in the classroom and that the district would be sending Davis a letter informing her of that decision. (ECF No. 49-2 at 403 (Woodburn Email)). However, nothing in the record suggests that Clapper ever sent such a letter, or that it was otherwise communicated to Davis that she would no longer be permitted to perform classroom observations. Davis does not claim to have requested to do another classroom observation after this time. Under these circumstances, no reasonable jury could find that Davis suffered an adverse action based upon the Woodburn email.

of these two points can sustain a retaliation claim for defendants' denial of the February 10, 2012, classroom observation because they permitted Davis to do an observation the day before. If defendants desired to retaliate against Davis for her complaints prior to February 9, 2012 by denying her access to the classroom, they would not have allowed her to visit E.D.'s classroom that day either. While Davis did meet with Clapper and Ondek after her observation on February 9, 2012, that conversation seems to have been indistinguishable from the complaints she had already made. (*See* ECF No. 65 ¶ 119). Davis does not offer an explanation of what changed between February 9, 2012, and February 10, 2012, that would allow a reasonable jury to find there was a causal connection.

Even if a reasonable jury could find an adverse action based on the February 23, 2012 email from Woodburn indicating that Clapper told the union Davis would no longer be permitted to observe Lindemann's classroom – which it did not, *see supra* note 13, at 42 – this also does not support a retaliation claim. As already discussed, that defendants may have been concerned about a lawsuit or felt threatened by Davis do not alone or together establish retaliatory motives. To bolster this notion with respect to her own retaliation claims, Davis points to Clapper's testimony that he thought having Davis in the classroom intimidated Lindemann and affected his teaching performance. (ECF No. 49-1 at 248-49 (Clapper Depo. at 65:17-66:2)). There is, however, a difference between defendants taking steps to protect Lindemann from continued perceived harassment by Davis and defendants seeking to retaliate against Davis for engaging in protected conduct. *See Picarella v. Terrizzi*, 893 F.Supp. 1292, 1303 (M.D. Pa. 1995) ("We see no constitutional injury in a principal shielding faculty members from parents who are perceived as troublesome."); *see also Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (Consequently,

'[t]o properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial.'") (quoting *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)).  To reiterate, there is no evidence Davis was banned from other school activities, was excluded from any discussion about creating a plan for E.D., or was ever denied any opportunity to speak with any QVSD official besides Lindemann, with whom she herself declared she was no longer willing to speak.  Therefore, in most instances Davis cannot show that she suffered an adverse action.  Even where she can, there is no evidence of record that is sufficient to support a causal link between her protected activity and the alleged, retaliatory actions taken by defendants.

For these reasons and those discussed elsewhere in this memorandum opinion, defendants' motion for summary judgment will be granted with respect to the Title VI retaliation claim Davis brings on her own behalf and judgment will be entered in favor of QVSD on this claim.

### C.  <u>Section 1981 Claims</u>

Section 1981 broadly prohibits discrimination on the basis of race.  It provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  "Ordinarily, to establish a basis for relief under section 1981 a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981."  *Estate of Olivia ex rel. McHugh*, 604 F.3d at 797.  As with the other

statutes under which Davis sues, discrimination and retaliation claims under § 1981 based upon circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *See id.* at 798; *Jones*, 198 F.3d at 410.

### i.   E.D.'s § 1981 Retaliation Claim

The elements of E.D.'s Title VI retaliation claim are essentially the same as E.D.'s § 1981 retaliation claim. *See Whitfield*, 412 F.App'x at 522; *Estate of Olivia ex rel. McHugh*, 604 F.3d at 798. For the reasons discussed with respect to the Title VI claim, Davis failed to adduce evidence showing a causal connection between her protected activity and defendants' treatment of her son and failed to show pretext. Judgment will be entered for defendants on Davis's § 1981 retaliation claim brought on behalf of her son.

### ii.   Davis's § 1981 Discrimination Claim

Very little of Davis's primary brief and none of her sur-reply brief are dedicated to her own discrimination claims. In order to make out a prima facie case of racial discrimination in the context of this case, i.e., circumstantial evidence in an educational setting, a plaintiff must show: (1) she is a member of a protected class; (2) she was qualified; (3) she suffered an adverse action; and (4) the circumstances of the adverse action give rise to an inference of unlawful discrimination. *See supra* at 21. The first two prongs are satisfied because Davis is a member of a protected class and there is no indication she was somehow unqualified. As discussed with respect to her Title VI retaliation claim, the only alleged adverse action suffered by Davis is that school officials prevented her from doing an additional classroom observation on February 10, 2012. *See supra* at 41-42.

Defendants argue that Davis did not satisfy the fourth prong of a prima facie case –

showing that the circumstances of the adverse action give rise to an inference of unlawful discrimination. Specifically, defendants assert that she failed to identify any similarly situated comparators. (ECF No. 47 at 25-28 (Defs.' Brief)). In fact, Davis did not even attempt to do so in her briefs. (*See generally* ECF Nos. 55, 66). It is not enough to say that she assumes other Caucasian parents were permitted to observe the classroom. Davis was permitted to do a classroom observation on February 9, 2012. (ECF No. 65 ¶ 55). She did not adduce evidence that another parent was permitted to do two classroom observations. Davis makes no other arguments to support the fourth prong. No reasonable jury could find that she established a prima facie case.

Because Davis failed to adduce sufficient evidence to establish a prima facie case of discrimination on her § 1981 discrimination claim, the court will grant summary judgment in favor of defendants on that claim.

### iii. Davis's § 1981 Retaliation Claim

The elements of Davis's Title VI retaliation claim are the same as Davis's § 1981 retaliation claim. *See Whitfield*, 412 F.App'x at 522; *Estate of Olivia ex rel. McHugh*, 604 F.3d at 798. For the reasons discussed with respect to Davis's Title VI retaliation claim, Davis failed to adduce evidence showing a causal connection between her protected activity and defendants' decision not to allow her to perform a second classroom observation. Judgment will be entered for defendants on Davis's § 1981 retaliation claim.

### D. Section 1983 Claims

"Title 42 U.S.C. § 1983 is not a source of substantive rights but a vehicle for vindicating rights conferred by the U.S. Constitution or by federal statute." *DiBella v. Beachwood*, 407 F.3d

599, 601 (3d Cir. 2005). "To make a prima facie case under § 1983, the plaintiff must demonstrate that a person acting under color of law deprived him of a federal right." *See Groman v. Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983. This remedial statute does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129 n.11 (1980). "A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right." *Ickes v. Borough of Bedford*, 807 F.Supp.2d 306, 315 (W.D. Pa. 2011). The *McDonnell Douglas* burden-shifting framework is applicable for race discrimination claims under § 1983. *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).

### i. E.D.'s § 1983 Claim

Davis brings a claim on behalf of E.D. for alleged violation of his equal protection rights. The elements of E.D.'s Title VI discrimination claim are the same as E.D.'s § 1983 discrimination claim. *See Gazarox*, 80 F.App'x at 204-05; *Stewart*, 120 F.3d at 432. For the reasons discussed with respect to E.D.'s Title VI discrimination claim, Davis on behalf of E.D. failed to adduce sufficient evidence to establish a prima facie case or demonstrate pretext under the *McDonnell Douglas* analysis. Because that analysis is applicable to race discrimination claims brought under § 1983, judgment will be entered for defendants on E.D.'s § 1983 claim.

### ii. Davis's § 1983 Claims

Davis brings a discrimination claim alleging violation of her equal protection rights and a

retaliation claim alleging violation of her free speech rights pursuant to § 1983.  The elements of Davis's § 1983 discrimination claim are the same as Davis's § 1981 discrimination claim.  *See Stewart*, 120 F.3d at 432; *Jones*, 198 F.3d at 410.  Likewise, the elements of Davis's Title VI retaliation claim are the same as Davis's § 1983 retaliation claim.  *See Whitfield*, 412 F.App'x at 522; *Thomas v. Independence Twp.,* 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003)).  For the reasons discussed elsewhere in this memorandum opinion with respect to Davis's other claims, Davis failed to adduce evidence supporting a prima facie case of discrimination and failed to adduce evidence supporting a causal connection between her protected activity and purportedly retaliatory actions on the part of defendants.  Judgment will be entered in favor of defendants on Davis's § 1983 claims brought on her own behalf.

## V.    CONCLUSION

For the foregoing reasons, judgment will be entered in favor of each defendant with respect to the claims asserted against that defendant and against Davis and E.D. with respect to those counts asserted by each plaintiff.

An appropriate order follows.


Dated:         March 10, 2016

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge